**ANTILLES STEAMSHIP COMPANY, LTD., Plaintiff,**

v.

**The MEMBERS OF the AMERICAN HULL INSURANCE SYNDICATE, et al., Defendants.**

No. 80 Civ. 7426 (WCC).

United States District Court,
S. D. New York.

May 24, 1982.

Waesche, Sheinbaum & O'Regan, P. C., New York City, for plaintiff; Donald M. Waesche, John R. Foster, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendants; Joseph J. McGrath, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Plaintiff Antilles Steamship Company, Ltd. ("Antilles") brought this action seeking to recover under a contract of marine insurance for damage to its vessel, the Alchemist. The case was tried by the Court without a jury and by consent of Antilles and defendants, 62 insurance companies, the trial was limited to the question of liability. The following opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

*Background*

Prior to trial, the parties submitted a stipulation in which they agreed on most of the relevant facts. Accordingly, only limited evidence was presented at trial and the following factual recitation is derived largely from the parties' stipulation.

Antilles, a Liberian corporation, is the owner and operator of the T/V Alchemist and is engaged in business as an ocean carrier of chemicals. The Alchemist is a tank vessel with 34 tanks designed for the carriage of liquid chemicals. During the relevant period, the Alchemist was managed and operated by the Steuber Company. In September of 1975, James Kingston ("Kingston") was a marine superintendent for Steuber.

Defendants are 62 insurance companies, both foreign and domestic, engaged in the business of underwriting marine insurance. The American Hull Insurance Syndicate ("the Syndicate") consisted at all relevant times of 53 insurance companies organized to insure ocean-going vessels. On or about September 14, 1975, Antilles and defendants entered into two contracts of marine insurance. Antilles is an assured on the policies, which provide coverage against loss or damage to the hull and machinery of the Alchemist. Both contracts are essentially the same, with the first (Plaintiff's Exhibit 13) being with the Syndicate and the second (Plaintiff's Exhibit 14) being with the remaining defendants. The non-Syndicate defendants contracted in their policy to "follow the leading Underwriter [the Syndicate] in all or any settlements or agreements pertaining to losses and/or claims, including legal proceedings, and in the settlement thereof, . . . ." The relevant portion of the policies states that "this insurance also covers loss of or damage to the vessel directly caused by the following . . . Explosions on shipboard or elsewhere; . . . ." Lines 80, 81, 84 of Plaintiff's Ex. 13, 14.

Seventy per cent of the risk was insured in the American market with defendants; the remaining thirty per cent was underwritten in London. The English policy contained clauses identical to those at issue here.

Pursuant to a contract of affreightment between Antilles and Union Carbide Corporation, on September 12, 1975, the Alchemist loaded liquid chemicals for carriage from Taft, Louisiana to Antwerp, Belgium. One of the cargos placed on board was 202.22 tons of glacial acrylic acid ("GAA"), which was loaded in its monomer state into No. 6 starboard wing tank aft ("No. 6 SWA"). The Alchemist was also carrying a shipment of ethylene norbonene ("ENB"), which was stored in No. 6 starboard wing tank forward ("No. 6 SWF"). Both No. 6 SWA and No. 6 SWF are stainless steel, and they share a common wall.

GAA is a pure form of acrylic acid which, in its monomer state, looks and flows like water. When polymerized, however, GAA is a solid. The only chemical characteristic of ENB that is relevant to this lawsuit is its extremely noxious odor.

On September 16, 1975, while the Alchemist was at sea and the insurance policy in effect, the GAA explosively polymerized. The cause of the explosion has never been determined, but the result was extensive damage to the ship. The tank walls of No. 6 SWA bulged and the common wall between No. 6 SWA and No. 6 SWF ruptured. Seams opened in the tank walls of No. 6 SWA, thus allowing cargo to escape into the cofferdam, the space between the cargo tanks and the skin of the ship. The skin of the ship in the vicinity of No. 6 SWA bulged.

In order to reduce the tremendous heat being produced by the explosive polymerization of the GAA, the ship's personnel pumped seawater into the cofferdam. Because No. 6 SWA had ruptured, the GAA, ENB and seawater intermingled in No. 6 SWA, No. 6 SWF and the cofferdam.

Despite the explosion, the Alchemist continued its voyage to Antwerp where it discharged all of its cargos except the GAA and ENB. The public authorities in Antwerp forbade any attempt to unload the commingled GAA, ENB and seawater because of the extremely noxious and penetrating odor emanating from the damaged tanks. While the ship was in Antwerp, numerous meetings were held to discuss possible ways of repairing the vessel. These meetings were attended by various surveyors and representatives of Union Carbide as well as Kingston, who was responsible for getting the Alchemist ready to enter the shipyard.

Kingston testified at trial that Antilles unsuccessfully explored the possibilities of repairing the vessel without piecemeal removal of the polymer and liquid. Union Carbide was unable to suggest a solvent for the polymer. Removal of the entire affected area was rejected since such a procedure would have required cutting through good tanks and portions of the deck and because no welding or burning could be done on the ship. Moreover, disposal of the polymer presented problems. Antilles also was faced with continuing noxious odor from the ENB. Finally, Antilles contracted with

Booy Support ("Booy") to clean the tanks and the cofferdam and do everything else necessary to prepare the Alchemist for entry into a repair yard.

Accordingly, the Alchemist proceeded to the Booy tanker cleaning facility near Rotterdam. Work began on October 21, 1975 with the removal from the cofferdam, No. 6 SWA and No. 6 SWF of a brownish, liquid mixture consisting of GAA, ENB, seawater and lumps of polymer. Work then proceeded on No. 6 SWF, which contained approximately 1½ feet of semi-solid polymer at the bottom of the tank. Most of this material could be removed by high pressure washing equipment and vacuum trucks. The remainder of this phase of the job was completed by hand, using shovels.

Initial cleaning of No. 6 SWA then began with the use of high pressure washing equipment. Vacuum trucks were used to remove the wash water and the broken-up rubbery polymer. It then became necessary to remove by hand the hardened polymer, which extended from bulkhead to bulkhead in the tank and adhered to the bulkheads. The solid polymer was about 20 feet deep and became harder with depth. Ultimately, jack hammers had to be used to remove the polymer. During the 30-day period it took to clean No. 6 SWA, considerable damage was unavoidably done to the stainless steel skin of the tank. All work necessary for the Alchemist to enter the repair yard was complete on November 25, 1975. Antilles paid the costs incurred in Rotterdam.

Following the removal of the GAA, ENB and seawater and the preparation of the tank areas for repair, the Alchemist was moved to a shipyard where she was restored to her condition prior to the explosion of the polymer. Subsequently, Antilles' insurance brokers prepared a statement of particular average adjustment. The claim included the cost of repairs at the shipyard, the expenses incurred in Rotterdam and various related costs.

The London market, which had underwritten 30 per cent of the risk under the same terms as the policies at issue here, honored the claim and paid it in full. De-

fendants, the American market, paid the shipyard costs and various related expenses but refused to pay for the work done in Rotterdam. Defendants do agree that they are liable for the expenses incurred in removal of material from the cofferdam spaces. They also accept responsibility to pay for the removal of the last residue of the material clinging to the bulkheads of No. 6 SWA and No. 6 SWF. Thus, the only issue of liability contested by the parties is whether defendants are responsible for the cost of removing the bulk of the polymer from the cargo tanks themselves.

*Discussion*

The question whether a hull insurer is responsible for the costs of removing material, which has solidified from bulkhead to bulkhead and which has caused damage to the vessel, is one of the first impression in this jurisdiction. This somewhat arcane issue essentially boils down to whether cargo loaded is cargo forever or whether it can, under these circumstances, so change its character and have such an effect as to constitute damage to the vessel. Defendants' basic position is that material in the cargo spaces is always the ship owner's responsibility; Antilles argues that the solidified polymer actually constituted damage to the vessel.

Defendants' rationale for allowing the costs of removing material from non-cargo carrying areas and of removing the last residue of the polymer clinging to the cargo tank walls[1] is that they are expenditures necessary to prepare the ship for repair work. Transcript ("Tr.") 24.

Defendants, however, take the position that even though it also was necessary to remove all the polymer that lay on top of the thin layer of polymer that adhered directly to the tank in order to effect repairs to the ship, see Tr. 26, 31, the bulk of the solidified mass was not "damage to the vessel." Defendants' reasoning behind this position, which seemingly ignores the fact that the explosion and solidification of the GAA was the cause of the vessel's damage, is that "the cargo is in a compartment where it's supposed to be, and you have overlying that the shipowner's obligation to discharge cargo that he loaded." Tr. 26. Apparently, defendants would pay for the costs of removing the polymer had the material totally escaped the confines of the cargo tanks but because in this case it did not, the material is "cargo" and therefore its removal is the shipowner's responsibility.

Defendants rely on two opinions in support of their position.[2] In what is apparently the only judicial decision concerning the recoverability under a hull policy of the costs of discharging cargo,[3] the English Court of Appeals held that the costs were not recoverable. In *Field Steamship Company v. Burr*, (1899) 1 Q.B. 579, the vessel Elmfield was insured by a hull policy. The

---

[1] At the trial, Raymond M. Hicks, Jr., a claims manager of the American Hull Syndicate, testified concerning payment for the removal of cargo residue.

"THE COURT: Are you saying that the underwriter ought to be responsible for only the smallest possible layer of material that's adhering to the wall?

"THE WITNESS: Yes, sir.

"THE COURT: And if he could use a microtome and slice it down to a mono-molecular layer, that layer would be chargeable against the underwriter but none of the rest?

"THE WITNESS: Well, we couldn't put it that fine. Let's take the cement example. You have to use the jackhammers to get this, all right? There would come a point where if you use the jackhammer near the bulkhead, you are going to damage the bulkhead.

"Now, as a rule of thumb, when you reach that point, then we would pay for the rest where you would have to use more—say gentle methods or fine methods to do it. These cases happen so rarely that we don't have standards based upon experience."
Tr. 29.

[2] The parties have both briefed the issue of what law is applicable to this case. The Court has no disagreement with Antilles' contention that New York law would apply to this case but, as both parties have pointed out, there is virtually no case law on point in this or any other American jurisdiction. Consequently, the Court considers the English decision and the arbitration opinion, although not dispositive, relevant to this issue.

[3] There are apparently other such cases dealing with general average recovery as opposed to a particular average claim such as that at issue here.

vessel was loaded with a cargo of cotton-seed when she collided with another ship and ran aground to avoid sinking. When the crew attempted to discharge the cargo they discovered that river water and mud had become mixed with the seed, creating a manure-like substance. Not surprisingly, the consignee refused the shipment and the shipowner paid the costs of having the material discharged. Thereafter the shipowner sought to recover the costs from his hull underwriters on the theory that the cargo had to be removed in order to repair the vessel.

In rejecting the shipowner's claim at trial in the Queens Bench Division, the Court stated:

> "I think that where the insurance is upon the hull, materials and machinery of a ship, it is essential, before any claim at all can be made against underwriters, either that the shipowner should be deprived of his ship, or of the use of her, or that physical damage should happen to it by the direct action of the perils insured against. It is not enough for the shipowner to say, 'The perils of the sea have caused loss to me.' He must go further and show that they have caused loss of, or damage to, his ship."

[1898] 1 Q.B. 821.

4. Lord Justice Smith of the English Court of Appeals stated:

> "In this case the subject matter of the insurance is clear; it is hull and machinery, and nothing else. The perils against which this subject matter is insured is [sic] also clear; it is the deterioration occasioned to the hull and machinery by perils of the sea. Having got thus far, it follows that to constitute a claim upon a marine policy covering hull and machinery against sea perils the assured must establish a deterioration to the hull and machinery by a sea peril, and this, when established, the underwriter of hull and machinery is liable to make good to the assured. This is the underwriter's sole liability, and so far as I can apprehend this cannot be disputed.
>
> \* \* \* \* \* \*
>
> "I will take for instance the case of a cargo of cement in bags solidified by a sea peril so as to become stone, and thus to cost more to discharge than otherwise would be the case. If by the solidification the cement got affixed to the hull or machinery, so that either the hull or

That judgment was unanimously affirmed by the Court of Appeals, the Court's reasoning being that damaged cargo was not damage to the ship. In his opinion, Collins, L.J. stated:

> "How can the presence of a putrid cargo in the ship be said to be a damage to the hull? The fabric of the ship is not injured by it; so far as it affects the ship at all, it is by interfering with its use until it is removed. But this is not damage to the hull, which is insured, but damage to the shipowner, as Mr. Carver pointed out in his business as carrier.
>
> \* \* \* \* \* \*
>
> "Here (on the hypothesis by which I am testing the plaintiff's case, *viz.*, that of no physical damage to hull) the real sea damage was to the cargo, the incidental consequence is that the ship cannot be used again till the damaged cargo is removed, and is therefore, on the same reasoning, not due to a sea peril as the *causa proxima*." [4]

[1899] 1 Q.B. at 589.

Defendants acknowledge that the present case differs from *Field* in that here the explosive polymerization and resulting solidification of the cargo caused the damage to the ship's hull. They contend nonetheless that there is no "logical connection"

machinery became damaged, I can understand the argument that for this damage the underwriter upon hull and machinery might have to pay, but for the mere extra cost of removal of the cargo at the port of destination, with which removal the underwriter upon hull and machinery has nothing to do, in my opinion the underwriter upon hull and machinery is not liable." [1899] 1 Q.B. at 582–83, 587.

Lord Justice Chitty, the third judge on the panel, also agreed that the underwriters would be responsible for paying for the removal of cargo adhering to the ship.

> "It may well be that in such a case as that, the underwriters would be liable for the expense of clearing the inside of the ship from the cement adhering to it, for that could be reasonably regarded as a damage to the structure of the ship. But, as regards the expense of clearing away the rest of the cement at the port of destination, that would merely present the question on this appeal in another form."

*Id.* at 588.

between that fact and an ensuing obligation of the underwriters to pay for removal of the polymer from the cargo space. However, it is difficult to perceive any distinction between a cargo which *constitutes* damage to a vessel and one which *causes* damage.

In *Field*, both the trial court and the Court of Appeals indicated that the determinative factor in their decisions was that damage to the cargo was only an incidental consequence of the damage to the hull, the event insured against. The damaged cargo in *Field* did not affect the structure of the vessel, and the only interference with its use was readily remediable by an uncomplicated process of removing the cargo. Clearly that was not the situation here since the GAA explosively polymerized, damaging the hull and forming a solid, refractory mass which could be removed only with great difficulty and with further damage to the vessel.

Defendants also rely on *Barge J. Whitney*, 18 A.M.C. 995, which was decided by an arbitrator. In the *Whitney* case, a cargo of asphalt was shipped from California to Alaska. Because the shippers knew that the asphalt would solidify in transit, heating coils were installed to liquefy the cargo upon arrival. The coils were damaged during the loading of the cargo, however, and the removal of the asphalt proved extremely difficult and expensive. The barge owners submitted the claim for removal of the cargo to its hull insurer, apparently on the theory that the hull had been damaged during the removal of the asphalt. The arbitrator found the case to be nearly indistinguishable from *Field* and concluded that the underwriters would be responsible only for

"the cost of removing material adhering to the tanks after all of the sound cargo had been discharged." *Id.* at 1007.[5] The arbitrator distinguished between substances washed into a vessel by typical sea perils and "cargo intentionally loaded into a barge which is difficult to unload solely because its form has changed from liquid to solid because of difficulty with the internal heating facilities of the vessel." *Id.*

The instant case does not concern cargo that merely changed form and consequently became more expensive to discharge. *Whitney*, unlike this case, involved damage to the hull that arose entirely as an incident of removing the cargo. Here, the cargo exploded, causing the essential damage to the Alchemist prior to any attempt to remove the polymer. The polymer was adhered from bulkhead to bulkhead; there was no way to repair the ship without first removing all of the polymer. There is no question that the policy covered all damage to the ship resulting from the explosive polymerization; the same explosive polymerization which caused damage to the ship's structure also caused solidification of the cargo which had to be removed before the structure could be repaired.

Defendants refer the Court to two texts on the subject of marine insurance. In the cited passages of both *Arnould on Marine Insurance* (16th ed. 1981) and *Marine Insurance & General Average in the United States* (2d ed. 1981), the commentators take the position that while the costs of removing cargo residue is recoverable (as is the cost of removing cargo from non-cargo areas), the costs for removal of the bulk of the cargo are not. In *Marine Insurance, supra*, the commentator stated:

---

**5.** The arbitrator also ruled that the underwriters would be responsible for the costs of repairing the main deck, which apparently was damaged while temporary heating coils were installed. Defendants accordingly suggest that, like here, the cargo in *Whitney* "caused" the damage to the hull, yet the arbitrator did not hold the underwriters responsible for the costs of removing the asphalt. This comparison is of no help to defendants, however, since in *Whitney*, the damage was incidental to the removal of the cargo. The removal of the cargo was the main problem, not the damage to the vessel

caused by the explosion and solidification of the cargo.

The arbitrator's reference to the removal of the "sound cargo" is somewhat ambiguous. In the present case, there was no sound cargo to be removed and therefore *Whitney* could be read to suggest that in this case the underwriters should be responsible for the entire cost of discharge. The description of the facts in *Whitney*, however, indicates that the entire cargo was solidified and thus the reference to "sound" cargo is somewhat unclear.

"In practice if, for example, the damaged cargo has solidified and has adhered to the structure of the vessel so that in effect the vessel has sustained damage, the cost of removing that part which has adhered to the vessel is recoverable from hull underwriters as part of the reasonable cost of repairs. This is necessarily an arbitrary division, but usually a percentage is allowed, depending on the width of the solidified mass. Similarly, if the cargo debris has entered places where cargo would not normally be (such as the engine room, pump room or double-bottom tanks), the cost of cleaning and removing such cargo is considered 'damage' and therefore part of the reasonable cost of repairs. In all other circumstances, the cost of removing cargo debris from a vessel (whether or not such removal is necessary to effect repairs) is not considered to be part of the cost of repairs but rather a consequential loss or enhanced voyage expense. Such extra expenses may be recoverable from freight underwriters or Protection and Indemnity underwriters, depending on the circumstances in each individual case."

*Id.* at 158.

The Court agrees that a division between the residue and the bulk of the solidified mass is "arbitrary." More important, however, is that neither of these commentators appeared to be addressing a situation where the material caused damage to the ship other than by mere adherence to it. In addition, the fact that the London market paid the claim undercuts defendants' argument that the law, especially English law, requires rejection of Antilles' claim. Defendants' conjecture that Antilles managed to slip the claim unnoticed by its London underwriters strains credulity.

Defendants suggest that a Pandora's box will be opened if the Court undoes "the common understanding of those who buy and sell hull insurance." Defendants' Reply Brief at 3. Such fears are unwarranted. First, "the common understanding" does not appear to have been shared by the English underwriters. Second, the unusual

facts of this case make it unlikely that defendants will be inundated with claims for removal of cargos since it is the rare case where a change in form of the cargo causes structural damage to the ship, as evidenced by the absence of any precedent governing such circumstances.

The Court concludes that the hull policy covers the cost of removing all of the hardened polymer. If the parties cannot agree on the amount of such costs, they should contact the Court's chambers to arrange a pre-trial conference to set a date for trial of this issue. If they can agree, plaintiff should submit a proposed judgment order on five days' notice to defendants.