**UNITED STATES of America, Appellee,**

**v.**

**Abraham CEBALLOS and Efrain Adames, Defendants-Appellants.**

**Nos. 371, 516, Dockets 86–1273, 86–1299.**

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1986.

Decided Feb. 13, 1987.

*v. Anderson*, 532 F.2d 1218, 1230 (9th Cir.1976), *cert. denied*, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107.

Peter Shelley Zeiler, New York City, for defendant-appellant Ceballos.

Phylis Skloot Bamberger, The Legal Aid Society, New York City, for defendant-appellant Adames.

Baruch Weiss, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., Kenneth Roth, Asst. U.S. Atty., New York City, on the brief), for appellee.

Before FEINBERG, Chief Judge, NEWMAN and MINER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

The principal issue raised on this appeal is whether a criminal suspect who passively obeys a law enforcement agent's stern request to accompany him to his field office for questioning has been "seized" within the meaning of the Fourth Amendment to the United States Constitution. The issue arises on an appeal by Efrain Adames and Abraham Ceballos from judgments of the District Court for the Southern District of New York (Gerard L. Goettel, Judge) convicting them on their pleas of guilty to counterfeiting and conspiracy violations, 18 U.S.C. §§ 2, 371, 474 (1982). Both defendants reserved the right to challenge on appeal the denial of their motions to suppress physical evidence seized and statements made at or about the time of their arrests. Because Secret Service agents placed Adames in investigatory custody before they had probable cause to arrest him, we reverse the District Court's denial of Adames' suppression motion. We affirm Judge Goettel's denial of Ceballos' suppression motion.

## Background

On March 4, 1985, George Mazawey of Correy & Allen Paper Company contacted Secret Service agents to report that "Abe Ceballos" and a man named "Efrain" had purchased 15,000 sheets of an expensive type of paper often used to produce counterfeit bills. Mazawey noted that the buyers had never previously bought paper from his company, had no obvious need for such paper, and had paid cash. Mazawey also reported the license plate number of the truck used to pick up the paper; the truck was registered to Royal Molds, Inc. ("Royal Molds"), Adames' employer.

On March 11, 1985, at mid-afternoon, four Secret Service agents arrived in two cars at Royal Molds, a tool and die company. Agent Powers went alone into the shop while another agent remained in the stairwell. Agent Powers displayed his badge to the supervisor and asked to speak with Adames. The supervisor summoned Adames to the office. During the suppression hearing, Agent Powers provided the following description of his first encounter with Adames:

[cross-examination by Atty. Joy, counsel for Adames]

Atty. Joy: [D]id you ask [Adames] to come [with you to the field office] after he completed work?

Agent Powers: I asked him if it was possible if he could get off a little bit early and come with us.

Atty. Joy: And then you say he asked his supervisor whether he could ... get off?

Agent Powers: I believe they discussed his shift, what time he ended, and it was a matter of a half-hour or so, and he [the supervisor] told him to go ahead.

Atty. Joy: And well, did you say to him, "Well, look, you know, you can come anytime you want"?

Agent Powers: No, we didn't say that to him. We had to speak to him.

Atty. Joy: You s[ai]d he had to come with you now?

Agent Powers: Not that he had to come, but he sensed the urgency of it, and we would wait until he got off work but if he could come now, it would be better all around.

Atty. Joy: How did you express the urgency? You say he sensed the urgency? How did you express to him the urgency?

Agent Powers: Well, I think the fact ... that his supervisor went over and got him and told him that there was someone from the law enforcement community that wanted to speak to him.... I think he said something along the

lines of the police are here, they want to talk to you.

.     .     .     .     .

Atty. Joy: So you said, let's go down to the precinct, is that right?

Agent Powers: Yes, I said that.

Atty. Joy: Did you show your badge to Mr. Adames?

Agent Powers: I believe I did. I'm not sure.

Transcript of Suppression Hearing, January 28, 1986, at 200–01, 203. Judge Goettel found that the agents "initially indicated they would be taking [Adames] to their office for questioning." Memorandum Decision of District Court at 2 (April 3, 1986). Agent Powers scrupulously watched Adames as he got his coat.

Upon leaving Royal Molds, Adames asked the agents if he could follow them to their office in the company van which he was authorized to drive and customarily used to drive home. The agents refused and accompanied Adames back into the shop to return the keys to the supervisor.

Adames, Agent Powers, and another agent entered a car parked in front of Royal Molds. Without speaking, they drove one block to another car, which contained Agent Cases. Once in the second car, Agent Powers told Adames that he was a Secret Service agent investigating counterfeiting. Speaking in Spanish, Adames' first language, Agent Cases then read Adames his constitutional rights and advised Adames that he was not under arrest. Adames was not handcuffed.

The agents initially intended to drive Adames directly to the Secret Service field office. Agent Cases proceeded to question Adames in the car. Adames stated that he was planning a business to produce flyers and intended to use the paper to practice printing. In light of the high cost of the paper, the agents found this explanation to be implausible. After they had been driving about five minutes, Adames offered to take the agents to his brother's house, where the paper was being stored. They proceeded to that house. With Adames' assistance, they carried three cartons of paper to the agents' car.

Adames then told the agents that he had a printing press at his residence and offered to take them there. They proceeded to Adames' home. Adames showed the agents the printing press, which they recognized as being capable of producing counterfeit bills if the necessary plates were available. They knew that 90% of counterfeit bills in the New York area are printed on presses of that type. The agents also saw several inks, including green and black inks. The green ink was on a rag and a baking tray, suggesting active use. Adames denied having printed counterfeit bills.

The agents then took Adames to the Secret Service field office. Neither at this time nor thereafter did Adames ask to leave, nor was he physically restrained. On the other hand, the agents never told him that he could leave, and it was clear that he would have been restrained had he attempted to do so. *See* Memorandum Decision of District Court at 3 (April 8, 1986).

They arrived at the field office at 6:00 p.m. and put Adames in a small, locked interview room. Agent Powers again told Adames that he was not under arrest. The agents proceeded to question Adames for several hours. The agents warned Adames that his paper and press and the company van were subject to forfeiture and that his brother might have serious problems if the paper purchase was not cleared up. Adames made several incriminating statements involving Ceballos and stated that Ceballos had produced and currently possessed counterfeiting plates. At the agents' behest, Adames attempted repeatedly to contact Ceballos by phone, but without success. As the evening wore on, the agents offered Adames a sandwich and coffee.

At about 8:30 p.m., the agents asked Adames if he would take a polygraph test. Adames signed consent forms stating that he agreed to take a polygraph test and that he was aware of his constitutional right to remain silent. A test was finally administered at 10:00 p.m. upon the arrival of a polygraph examiner. After the examiner

reported that the test indicated Adames was lying, the agents again warned him of the severe consequences of a criminal conviction for counterfeiting. Adames alleges that he was then roughed up by the agents, but Judge Goettel discredited this claim, noting that there was no physical evidence to support it. The agents denied using physical force. Thereafter, Adames acknowledged that he had lied and that he and Ceballos had printed some counterfeit bills which, because of poor quality, had never been passed.

Adames agreed to assist the agents in obtaining the plates from Ceballos the next morning. On the morning of March 12, Adames accompanied the agents to P & J Printing, the printing shop where Ceballos worked. Adames introduced Ceballos to Agent Cases, who was posing as a potential purchaser of the plates. Ceballos did not fall for the ruse.

Adames was taken back to the field office, where he signed a typed statement that recounted his oral admissions of the previous evening. Adames was released in the early afternoon without being charged with any crime.

After Adames left Ceballos' place of work, a number of agents entered P & J Printing, handcuffed Ceballos, and escorted him out. Thereafter, they advised him of his rights. Ceballos was taken to the field office and questioned. The agents warned Ceballos of the seriousness of a counterfeiting offense and threatened to get a search warrant unless Ceballos consented to a search of his apartment. They offered to help Ceballos obtain low bail and retain his job if he cooperated. After a couple of hours, Ceballos gave a full statement and consented to a search of his apartment. At the apartment, Ceballos located the plates and surrendered them. Ceballos was taken back to the field office, whereupon he and Adames were indicted on counterfeiting and conspiracy charges.

Adames and Ceballos filed motions to suppress their statements and physical evidence discovered near the time of their arrests. Judge Goettel denied their motions. Pursuant to Fed.R.Crim.P. 11(a)(2),

Adames and Ceballos then entered conditional guilty pleas to charges of violating 18 U.S.C. § 474 (1982) (plates or stones for counterfeiting obligations or securities) and conspiring to violate 18 U.S.C. § 474, in violation of 18 U.S.C. §§ 2, 371 (1982), reserving the right to appellate review of the adverse suppression rulings.

### Discussion

#### I. Adames' Contentions

Adames contends that he was placed in investigative custody without consent from the time that he was taken from his place of work. He further contends that since the agents lacked probable cause to arrest at that time, the custody violated the Fourth Amendment and therefore all evidence and statements subsequently elicited from Adames must be suppressed because the causal chain between the illegal arrest and the statements and seizures was not broken. *See Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979). Judge Goettel found that Adames was not placed under arrest until he was taken from his home to the field office. Contrary to Adames' assertion, Judge Goettel found that Adames voluntarily left his job with the agents and consented to the seizure of the paper at his brother's house and the search of his own residence. By this time, the agents had seen the paper, printing press, green and black inks, and indications suggesting that the press and green ink had recently been used. On this basis, Judge Goettel concluded that the agents had probable cause to arrest Adames when they left his home and took him to their field office.

A person has been " 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion of Stewart, J.) (footnote omitted). Although the determination of what a reasonable person would have thought is normal-

ly a question of law, *see Antilles Steamship Co. Ltd. v. Members of American Hull Insurance Syndicate,* 733 F.2d 195, 206 (2d Cir.1984) (Newman, J., concurring), we believe that Judge Goettel's conclusions are entitled to *some deference* because the determination in this case is inextricably intertwined with the credibility of the witnesses.[1]

We note preliminarily that we accept Judge Goettel's findings as to historical facts. *See United States v. Mast,* 735 F.2d 745, 749 (2d Cir.1984) ("The settled rule is that a district court's findings of fact may not be disturbed unless the findings are clearly erroneous."). To the extent that these findings are incomplete, we accept the factual testimony of Agents Powers and Cases. *See United States v. Waltzer,* 682 F.2d 370, 371 n. 2 (2d Cir.1982) (noting that for purposes of reviewing the denial of a suppression motion, the evidence must be viewed in the light most favorable to the Government), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983).

■ Whether a reasonable person would have believed that he was free to leave is to be determined from the circumstances *as they unfolded* before Adames. *See United States v. Mendenhall, supra,* 446 U.S. at 554, 100 S.Ct. at 1877 (plurality opinion of Stewart, J.). In the present case, Agent Powers initiated the encounter with Adames by asking his supervisor to tell him that law enforcement agents were waiting in the Royal Molds office to speak with him. When Adames came to the office, Agent Powers flashed his badge and told Adames that they wished to take him to their office for questioning. Agent Powers testified that Adames sensed the "urgency" of the situation and that the agents "would wait until he got off work."[2] The record indicates that Agent Powers scrupulously watched Adames as he prepared to leave. Upon leaving Royal Molds, the agents denied Adames' request to follow

---

1. The Supreme Court has not been precise in stating whether a trial court's conclusion as to Fourth Amendment custody is a question of fact or a conclusion of law. In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), a case involving a search and arrest of a person fitting the "drug courier profile," *see id.* at 493 n. 2, 103 S.Ct. at 1322 n. 2, a plurality of the Court appears to reach an independent conclusion that the defendant was seized within the meaning of the Fourth Amendment:

   Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for purposes of the Fourth Amendment.

   *Id.* at 501, 103 S.Ct. at 1326 (plurality opinion of White, J.). Earlier in his opinion, however, Justice White states that the issue is whether the record supports the conclusion reached by the state intermediate appellate court whose judgment was being reviewed. *Id.* The state appellate court had disagreed with the trial court. A plurality of the Supreme Court was more explicit in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the first major drug courier profile case, rebuking the Court of Appeals for substituting its view of the evidence for that of the District Court. *Id.* at

557, 100 S.Ct. at 1878 (plurality opinion of Stewart, J.) (citing *Jackson v. United States,* 353 F.2d 862 (D.C.Cir.1965) (applying a "clearly erroneous" test)). *But cf. Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966) (stating that appellate courts are to make "an independent determination of the ultimate issue of voluntariness" of a confession).

2. Agent Powers testified further that the agents would have restrained Adames had he walked away. Although this intention might well have colored the manner in which the agents dealt with Adames and would therefore seem at least relevant to whether a reasonable person would have felt free to leave during this encounter, the Supreme Court has recently stated: "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *Berkemer v. McCarthy,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984). This statement is not readily reconciled with statements in *Dunaway v. New York, supra,* 442 U.S. at 203, 215 n. 17, 99 S.Ct. at 2258 n. 17, and *Florida v. Royer, supra,* 460 U.S. at 503, 103 S.Ct. at 1327, emphasizing the significance of law enforcement officers' subjective intent. *Cf. United States v. Mendenhall, supra,* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6 (noting that subjective intention of police officers "is irrelevant except insofar as that may have been conveyed to the [suspect]"). Since we do not rely upon the agents' subjective intent in the present case, we need not attempt to square these differing views.

them in the company van and then escorted him when he returned to the office to return the keys. All the while, the agents avoided explaining the situation.

■ The present case illustrates the concern, articulated by the American Law Institute and noted in *Dunaway v. New York, supra,* 442 U.S. at 207 n. 6, 99 S.Ct. at 2253 n. 6 (1979), that a request to appear at a police station "may easily carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen." Model Code of Pre-Arraignment Procedure § 110.1 commentary at 261 (1975).[3] That concern was heightened in this case because the request to appear was made in person by law enforcement agents at Adames' place of work and in a manner that the principal agent admits conveyed a strong sense of urgency and the impression that the agents did not intend to leave without Adames. Though the agents offered to delay Adames' trip to their field office for a half hour, until his shift ended, it remained clear that he would have to accompany them at that time. This initial encounter seems to have created a stronger implication of legal obligation than in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion of White, J.), where Drug Enforcement Agency agents stopped Royer in a public airport. *See also United States v. Jefferson,* 650 F.2d 854, 856 (6th Cir.1981). The initial impression of obligation to accompany the agents was compounded by their denial of Adames' request to follow them in the company van. *Cf. United States v. Thompson,* 712 F.2d 1356, 1360–61 (11th Cir.1983). The agents did not tell Adames that he was free not to accompany them, a statement that would have dis-

pelled the impression already conveyed that he was obliged to go with them. Though an explanation of the right not to accompany agents for questioning is not a legal requirement to establish voluntary agreement to be questioned, *cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 234, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973) (knowledge of right to withhold consent to a search not a requirement of effective consent), such an explanation, credibly given, would normally serve the interests of law enforcement officials by defeating any claim that custody has begun. *Cf. Washington v. Chrisman,* 455 U.S. 1, 9, 102 S.Ct. 812, 818, 70 L.Ed.2d 778 (1982) (explanation of "absolute right to refuse consent" to search weighed in favor of finding of consent).

■ In light of Agent Powers' "request" to come to the field office for questioning, Adames' difficulty with English,[4] the agents' omission of any statement conveying to Adames a choice in the matter, and the sense of urgency and obligation admittedly conveyed, we have serious doubt whether a reasonable person in Adames' position would have felt that he was free not to accompany the agents the moment they left Royal Molds. We are certain, however, that a reasonable person would have felt obligated to accompany the agents immediately thereafter when they refused his request to follow them in a vehicle that he was authorized to drive. At that point, and surely by the time he was moved from one car into another car, Adames was in custody. The fact that he thereafter directed the agents to his brother's house and then to his own residence indicates only that he was trying to clear

---

3. To alleviate this concern, the Model Code requires that law enforcement officers "take such steps as are reasonable under the circumstances to make clear that there is no legal obligation to comply [with a request to appear at a police station]." Model Code of Pre-Arraignment Procedure § 110.1(3) (1975).

4. The reasonable person test does not " 'place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.' " *Berkemer v. McCarthy, supra,*

468 U.S. at 442 n. 35, 104 S.Ct. at 3153 n. 35 (quoting *People v. P.,* 21 N.Y.2d 1, 10, 286 N.Y. S.2d 225, 233, 233 N.E.2d 255, 260 (1967)). Nonetheless, we believe that the test does recognize obvious incapacities that critically bear upon voluntariness such as a lack of fluency in English or a significant hearing impairment. It does not seem overly burdensome for police officers to take these easily ascertainable attributes into consideration during investigatory encounters.

himself, not that he was not then in custody.

As support for his conclusion that Adames consented to leave Royal Molds with the agents, Judge Goettel notes that Adames was not told that he was under arrest and that the agents testified that Adames left voluntarily. The Government bore the burden of proving that Adames accompanied the agents voluntarily. *See Morales v. New York*, 396 U.S. 102, 105, 90 S.Ct. 291, 293, 34 L.Ed.2d 299 (1969); *United States v. Webster*, 750 F.2d 307, 321 (5th Cir.1984), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). The fact that government law enforcement agents did not inform a suspect that he was under arrest does not establish that he accompanied them voluntarily. *See Florida v. Royer, supra,* 460 U.S. at 494, 501–02, 103 S.Ct. at 1326 (plurality opinion of White, J.). Furthermore, the record does not support the conclusion that Adames left Royal Molds with the agents voluntarily. The agents never suggested to Adames that he was free not to accompany them. To the contrary, Agent Powers testified that he told Adames, "[L]et's go down to the precinct." The agents then denied Adames' request to follow them in a separate vehicle that he was authorized to drive. Adames did not offer to take the agents to his brother's house to look at the paper until five minutes into the questioning that had begun after they had entered a second Secret Service vehicle. Viewing the evidence bearing on Adames' decision to accompany the agents in the light most favorable to the Government, the most that can be inferred is that Adames passively submitted to authority. The historical facts found by the District Court do not support a conclusion that the Government met its burden of proving that Adames left his place of work with the agents voluntarily.

As a fallback position, the Government argues that the agents' actions constituted a valid *Terry* stop up until the point at which Adames offered to take the agents to his brother's house, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), after which the custody, searches, and statements were consensual. It is important to bear in mind, however, that *Terry* carved out only a limited exception to the probable cause requirement for seizures within the meaning of the Fourth Amendment. *See Dunaway v. New York, supra,* 442 U.S. at 210–11, 99 S.Ct. at 2255–56. In order to be valid, a *Terry* stop must be " 'reasonably related to the circumstances which justified the interference in the first place.' " *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (quoting *Terry v. Ohio, supra,* 392 U.S. at 20, 88 S.Ct. at 1879). *See generally* 3 W. LaFave, *Search and Seizure* § 9.2(f) (1978 & Supp.1986) (discussing time, place, and investigative method limits on *Terry* stops). By the time that the questioning had begun in the present case, Adames had already been requested to leave his place of work for police questioning, told that he could not drive separately in a vehicle that he was authorized to operate, placed in one police vehicle with two agents and driven one block, and moved to a second vehicle, and apparently was on his way to the field office. *Cf. United States v. Chamberlin*, 644 F.2d 1262, 1267 (9th Cir.1980), *cert. denied*, 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). This clearly exceeded the bounds of a legitimate stop under *Terry*.

■ We do not mean to suggest that law enforcement officers may never remove a suspect from his place of work for brief questioning. Upon reasonable suspicion and in appropriate circumstances, agents may require a suspect to step away from his place of work for a few moments to answer some questions regarding criminal activity. But when agents purposefully lead a suspect to believe that he is required to accompany them and without clear justification postpone questioning until he is in their car en route to the field office, they plainly exceed the bounds of *Terry*.

■ Having concluded that the Secret Service agents placed Adames in custody without probable cause and in a manner exceeding the limits of *Terry*, we must determine whether subsequent events sufficiently " 'attenuate[d] the taint of [the]

unconstitutional arrest' " to allow introduction at Adames' trial of the evidence seized from and confessions made by Adames. *Dunaway v. New York, supra,* 442 U.S. at 217, 99 S.Ct. at 2259 (quoting *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975)). The Government bears the burden of proving a break in the causal chain. *Brown v. Illinois, supra,* 422 U.S. at 604, 95 S.Ct. at 2262. Relevant to such a break are whether a *Miranda* warning was given, the temporal proximity of the detention and the alleged consents, the presence of intervening circumstances, and the purpose and flagrancy of the illegal arrest. *See id.* at 603–04, 95 S.Ct. at 2261–62.

In the present case, the consents to search were given within a few minutes of the illegal arrest. Immediately following the searches which led to the discovery of the paper, press, and green ink, the agents took Adames to their field office for prolonged interrogation, which eventually led to Adames' confession. At no time during this interrogation at the field office did Adames speak with anyone other than the agents. As in *Royer,* the consents to search and the statements given were too closely connected in context and time to the illegal arrest to break the chain of illegality. *See id.* at 502–03, 103 S.Ct. at 1326–27. Consequently, the District Court should have granted Adames' suppression motion.

## II. Ceballos' Contentions

■ Ceballos first contends that the agents lacked probable cause to arrest him at his place of work on March 12. Judge Goettel found that Adames' statement and cooperation created probable cause for Ceballos' arrest.

Probable cause to arrest exists "when the [agents] have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983) (citation omitted). Probable cause is to be determined from the "totality-of-the-circumstances." *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). " '[T]he evidence ... must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement,' " *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion of Rehnquist, J.) (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)), who in this case were experienced counterfeiting investigators.

The record contains ample indicia of probable cause under the "totality-of-the-circumstances" test adopted in *Gates v. Illinois, supra.* Adames' extensive statements, though lacking the reliability of a tested informant, contained significant indications of validity and were corroborated by other evidence before the agents. We have recognized that a participant in the criminal activity at issue "need *not* be shown to have been previously reliable before the authorities may rely on his statements." *United States v. Rueda,* 549 F.2d 865, 869 (2d Cir.1977) (emphasis in original). *See United States v. Gaviria,* 805 F.2d 1108 (2d Cir.1986). The fact that Ceballos worked at a print shop suggested that he had the background to produce plates. In addition, Mazaway, the paper company person who reported the suspicious purchase, implicated Ceballos. Viewing this evidence in the light most favorable to the Government and from the perspective of experienced counterfeiting investigators, we conclude that Judge Goettel did not err in finding that the agents had probable cause to arrest Ceballos.[5]

■ Ceballos next contends that his subsequent consent to search for and seize the counterfeiting plates and his incriminating statements were coerced and therefore must be suppressed as violative of the

---

5. Ceballos may not assert violation of Adames' Fourth Amendment rights as a ground for suppression of evidence against him. *See Alder-man v. United States,* 394 U.S. 165, 174–76, 89 S.Ct. 961, 966–67, 22 L.Ed.2d 176 (1969).

Fifth Amendment right against self-incrimination.

Under *Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966), we are to make an "independent determination of the ultimate issue of voluntariness" of a confession. The applicable standard is whether the confession is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte, supra*, 412 U.S. at 225, 93 S.Ct. at 2047. Judge Goettel found that the agents forcibly removed Ceballos from his place of work in handcuffs. There is also no question that the agents sought to persuade Ceballos to consent to a search and to confess. They warned him of the disruption to his household of execution of a court-ordered search warrant. They promised him aid in obtaining low bail and retaining his job if he cooperated.

Nonetheless, the totality of the circumstances suggest that Ceballos' consent to search and his confession were voluntarily given. The record indicates that the only use of force was in connection with the arrest. Thereafter the agents gave Ceballos a *Miranda* warning. They questioned him at their field office for a couple of hours before he consented to the search and confessed. Nothing in the record suggests that he was incapable of understanding or appreciating his *Miranda* rights. Viewing the evidence in the light most favorable to the Government, we find that the warnings made and promises offered by the agents did not overbear Ceballos' free will. *See United States v. Robinson*, 698 F.2d 448, 455 (D.C.Cir.1983); *United States v. Ferrara*, 377 F.2d 16, 17–18 (2d Cir.), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967).

## Conclusion

We conclude that the evidence seized from, and incriminating statements made by, Adames were causally connected to an illegal arrest. Consequently, we reverse the District Court's denial of Adames' suppression motion. We uphold the District Court's findings that Secret Service agents had probable cause to arrest Ceballos and that his subsequent consent to search and incriminating statements were voluntarily given; therefore, we affirm denial of Ceballos' suppression motion.

Conviction of Adames reversed; conviction of Ceballos affirmed.

MINER, Circuit Judge, dissenting in part:

Since I do not agree with the conclusion that Mr. Adames' incriminating statements were causally connected to an illegal arrest, I respectfully dissent from so much of the opinion as reverses the denial of his suppression motion and reverses his conviction.

The district court judge was required to determine, from the totality of the circumstances, "whether [Adames'] consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied." *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). After hearing the witnesses who testified on the issue of consent and observing their demeanor, the trial judge found that Adames' consent to leave his place of employment with the agents was voluntary. Since that finding is supported by the record, we may not replace it with our view of the evidence. *Id.* It seems inconsistent to accept the factual testimony of Agents Powers and Cases and the "historical facts" found by Judge Goettel but reject the judge's conclusions respecting voluntariness, when those conclusions reflect his evaluation of the testimony presented at the suppression hearing.

According to the evidence, the agents conveyed a sense of urgency to Adames when they visited him at his place of employment. What was urgent, however, was their need to *speak* to him, not their need for him to *accompany* them. In fact, the agents told Adames that they could wait until he got off work, and they later specifically advised him that he was *not* under arrest. Moreover, "the Secret Service agents testified that Adames left voluntarily and cooperated in what proved to

be a misplaced hope of clearing himself of suspicion." Memorandum Decision of District Court at 7 (April 8, 1986). That testimony seems quite plausible in light of the fact that Adames led the agents to the paper and printing press in an effort to persuade them that he was going into the business of printing flyers and was using the paper for "practice." It is also logical that the agents would treat Adames with great care to avoid any appearance of coercion or arrest when they first came to interview him. The investigation then was in its early stages, and the only "hard" information available to the investigators was the purchase of the special paper for cash by "Efrain" and the transportation of that paper in a truck registered to Adames' employer. The voluntary cooperation of Adames, therefore, was essential.

There can be no seizure of a person within the meaning of the fourth amendment unless a reasonable person would believe that he is not free to leave. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1878. The evidence here supports Judge Goettel's conclusion that there was no arrest until the agents took Adames to their field office after viewing the paper, press and ink. At this point, it was clear that Adames would have been restrained had he attempted to leave. There is no basis to disturb the determination that a reasonable person would have believed himself free to leave until that time. The question of custodial arrest generally is a factual one, and it seems wrong to me in this case to afford only a selective deference (i.e., "some deference," majority opinion, *ante,* at 1512) to Judge Goettel's conclusions.