**UNITED STATES of America,**

v.

**Thomas CAMACHO, Defendant.**

**No. 87 Cr. 0624 (RWS).**

United States District Court,
S.D. New York.

Nov. 16, 1987.

Rudolph W. Giuliani, New York City, for U.S.; Joan McPhee, Asst. U.S. Atty., of counsel.

The Legal Aid Soc., New York City, for defendant; Jack Lipson, of counsel.

## OPINION

SWEET, District Judge.

Defendant Thomas Camacho ("Camacho") has moved pursuant to Fed.R.Crim.P. 12 and 41 to suppress statements made and evidence found during a search of this apartment pursuant to a warrant on July 17, 1987. A hearing was held on September 21, 1987, at which parties requested and received leave to make further submissions. Final argument on the motion was heard on October 19, 1987, when the motion was marked fully submitted. For the reasons stated below, the motion is granted in part and denied in part.

**Facts**

In late June or early July, a film processing outfit named Seattle Film Works in Seattle, Washington noticed that a roll of film that had been sent to them for processing contained pictures of two Hispanic boys, neither of whom had reached puberty, dressed in leather and chain outfits. In some of the photographs, one of the boy's genitals were exposed. The company notified United States Postal Inspectors in the Seattle area, who arranged for the photographs to be developed and sent to Inspectors in New York, where the film originated.

United States Postal Inspector John McDermott ("McDermott") is assigned as a Prohibited Mailing Specialist, that is, an investigator whose task it is to investigate items that are illegal to send through the United States mail, including drugs, explosives, and child pornography. After receiving the developed pictures from Seattle, he arranged what is known as a controlled delivery. After an illegal substance has been discovered in the mails, a Postal Inspector, dressed as a regular mail carrier, delivers the package to the intended customer. Generally, after the customer accepts and signs for the illegal substance, a search warrant is executed, and depending on the results of the search, an arrest made.

At approximately 8:30 a.m. on July 17, 1987, Inspector McDermott made such a delivery to 19 Van Corlear Place, in the Bronx. The package he delivered contained the pictures discovered in Seattle. McDermott went to apartment 1–B at the Bronx address and knocked on the door. The defendant answered the door, and McDermott asked if he was a Mr. T. Nash. McDermott said that he had a delivery for him if he was. Camacho said that he was T. Nash, and McDermott, dressed as a mail carrier, told him that they knew that he had been complaining about some photographs that had been lost in the mail. McDermott said that the photos had been found in an empty sack, and that they had been sent over special delivery. According to McDermott, Camacho replied, "It's about time," signed the receipt, and took the package. McDermott then told Camacho that there was another package for him back in the truck, and returned to the truck to get the other package and three other Postal Inspectors.

McDermott and his colleagues quickly returned. With the other inspectors out of sight, McDermott knocked again, and had Camacho sign for the second package. As soon as Camacho signed, McDermott announced that he was a federal agent, and told him that he had a warrant to search the apartment. The warrant authorized the search for and seizure of:

> Photographs, negatives, undeveloped rolls of film, photographic equipment, letters, correspondence, bills and receipts, notes and ledgers, film envelopes, order forms, and telephone records all of which show orders of deliveries from the Seattle Film Works Company, constitution evidence, fruits, and instrumentalities of crimes (18 U.S.C. §§ 2251 and 2252) involving the sexual exploitation of children.

McDermott gave Camacho a copy of the warrant and asked him whether there were any weapons in the apartment. Camacho said that he was alone, and that there were no weapons in the apartment, but corrected himself and pointed the Inspectors to an air gun in his bedroom. After showing the air gun to the inspectors, Camacho said there were no other weapons in the house.

McDermott told Camacho that he was not under arrest, and told him that the warrant authorized them to search for child pornography. After Camacho replied that there was nothing like that in the apartment, Camacho and McDermott walked into the kitchen together, and saw lying there the two packages that had just been delivered, the first of which had been opened. McDermott took the photographs out of the opened package and showed them to Camacho, who identified the two boys. At this point it was approximately 8:45 or 8:50 a.m. According to McDermott, he could not elicit any further information about the pictures from Camacho.

Pointing to the labels on the packages that read "T. Nash," McDermott again asked Camacho if he was T. Nash, and, this time, Camacho said that he was not. McDermott asked for identification, and Camacho brought him his wallet, which McDermott went through.

After going through Camacho's wallet, McDermott asked Camacho to come into the living room with him in order to ask him some questions, and once there asked him to take a seat and remain seated. McDermott testified as follows:

[Mr. Lipson]: Now, there's no question in your mind ... that you did tell Mr. Camacho that you wanted him to stay, to sit down in a particular location in the apartment, right?

A. Yes, I did ask him to remain seated.

Q. And you didn't want him moving around?

A. I did not want him moving around, yes, sir.

Q. And it is a fact, is it not, that every time he did move around, even to go to the bathroom, you followed him?

A. Yes, sir.

Q. And you made it clear to him that you weren't going to permit him to go anywhere without your following him?

A. Yes, sir.

According to McDermott, Camacho was also told not to make sudden movements, and was told that this direction and the direction to remain seated was "for your safety and our safety."

At this point, McDermott again advised Camacho that he was not under arrest, and then read him his *Miranda* rights from a standardized form. Camacho was asked to sign a line that acknowledged that his rights had been read, but declined to do so. Next McDermott read a section at the bottom of the same form titled "WAIVER." It read:

I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Camacho declined to sign this section of the form as well. At no time did McDermott or anyone else advise Camacho that, at that point, he would have let Camacho walk out the front door and disappear.

After Camacho had indicated that he would not sign the waiver, McDermott asked him a series of so-called "personal history" questions, which included such questions about drug use. Camacho said that he did not use drugs.

On the few occasions that Camacho moved from his seat, McDermott followed directly behind him. When Camacho had to go to the bathroom, he was told to do so with the door open and McDermott right outside.

A number of drugs were recovered in the search, both licit and illicit. Some of the illegal drugs were discovered in bottles marked with generic drug names, such as Librium. The inspectors discovered a bottle that was labelled "Super Trip," a triple beam scale, a vial containing white powder with a spoon attached, and a narcotics price list.

One of the Inspectors found and opened a small brown and white jewelry box, which appears too small to contain even a canister of film. Inside, the Inspector discovered three small vials containing white powder. The various bottles and vials were all seized.

Camacho was formally arrested at approximately 11:00 a.m., when an inspector saw a knife in the bathroom while Camacho was again using the toilet with the door open so he could be observed. There was no testimony that Camacho, then or at any time previously, was reaching for the knife, or was in any way unruly towards the inspectors. The search also uncovered three pistols.

### Issues Presented

Camacho seeks the suppression of the various statements he made, both before and after he was read his *Miranda* rights, and also seeks the suppression of the drugs that were seized.

### The Statements

Camacho has moved for the suppression of his statements on the ground that they violate the rule set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The two issues here are whether and at what time Camacho was constructively "in custody" within the terms of *Miranda*, and, if he was in custody, whether he knowingly waived his rights.

Custody for *Miranda* purposes occurs when there has been "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (Quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). The statements at issue here were all made before formal arrest, so the issue is whether the conditions that the inspectors put on Camacho constituted a constructive arrest. The question is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *U.S. v. Ceballos*, 812 F.2d 42, 46 (2d Cir.1987) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)).

Apparently, the investigator's subjective intent to arrest a target is irrelevant to the "in custody" determination, *see Berkemer v. McCarthy*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time"), except perhaps to the extent that the intention to arrest is conveyed to the suspect, *see Mendenall*, 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6. Consequently, taking at face value Inspector McDermott's testimony that he would have allowed Camacho simply to walk out the door and escape, even after probable cause to arrest him had developed, the question is not McDermott's intent, but a reasonable person's perception in Camacho's shoes.

The question of whether someone believes that he is free to leave requires the court to examine the interaction between the citizen and the police officer as it evolves. Additional restraints, directions, questions or commands can at any time during an interrogation change a suspect's perception of whether he is free to go. Thus, the Circuit has directed: "Whether a reasonable person would have believed that he was free to leave is to be determined from the circumstances *as they unfold* before [the suspect]." *Ceballos*, 812 F.2d at 47 (emphasis in original). Factors such as strong "requests" given by police officers, *id.* at 48, "scrupulously watching" a suspect as he is doing things he is perfectly entitled to do, *id.* at 47, and otherwise conveying a sense of urgency and obligation all contribute to a suspect's reasonable perception that he is not free to leave, even if he is simultaneously informed that, officially, he is not under arrest, *id.* at 45.

In this case, when the Postal Inspectors first entered the apartment, the circumstances surrounding the initiation of the search did not create the kind of atmosphere in which a reasonable person would believe that he was required to remain. Inspector McDermott handed Camacho a copy of the warrant, explained its purpose, and told him he was not under arrest. Camacho had been given no directions, no warnings, and no restrictions had yet been placed on his movements. Consequently, the statements that Camacho made to

McDermott about the identities of the boys in the pictures will not be suppressed.

After Camacho showed McDermott his wallet, however, the tone of the interaction changed. McDermott directed Camacho into another room, and told him to sit down, remain seated, and make no sudden movements. McDermott testified that he said to Camacho words to the effect that this instruction was "for *your safety* and our safety" (emphasis added). McDermott also told Camacho that he would follow him anywhere he went in the apartment, and when Camacho had to go to the bathroom, he was followed, and told that he had to leave the door open to do so. Camacho was never told that he was free to leave. Finally, Camacho was read his rights, an act which the public at large knows generally attends an arrest.

These circumstances would lead a reasonable person to believe that he was not free to leave. Through the questions about who was in the pictures, not to mention the answers that Camacho gave, McDermott made it clear that he thought that they had the goods on Camacho. Being directed by a policeman to stay seated and make no sudden moves, for "your own safety," would certainly lead a reasonable person to believe that he was not free to move, even if told that you were not under arrest. Here, as in *Ceballos*, the inspectors never told Camacho that he was free to leave. As the Circuit has said, "Though an explanation of the right not to accompany agents for questioning is not a legal requirement to establish voluntary agreement to be questioned, such an explanation, credibly given, would normally serve the interests of law enforcement officials by defeating any claim that custody has begun." *Ceballos*, 812 F.2d at 48. For instance, in *United States v. Ross*, 719 F.2d 615, 617 (2d Cir.1983), the searching agents explicitly told a suspect that he was free to leave the site of the search, which the Circuit appeared to weigh heavily in deciding that he was not in custody at the time he made statements. *Id.* at 622.

Given that Camacho was constructively in custody for the purposes of the *Miranda* rule, the question then turns to whether he was properly informed of his rights and knowingly and voluntarily waived them. There is no dispute that Camacho was read his rights, and, indeed, handed a sheet on which they were written out. Camacho has urged, however, that his refusal to sign the written form waiving his rights is functionally equivalent to demanding to see a lawyer. That is, it is Camacho's claim that when he refused to sign the form that read: "I do not want a lawyer at this time," he was, in effect, demanding a lawyer, requiring that all questioning stop immediately.

As a policy matter, however, such a rule would discourage the use of waiver forms, which introduce some measure of certainty into difficult sphere of waiver of rights. Had Camacho wanted a lawyer, he could have simply said so, which he did not, or he could have changed the waiver form to read that he did want one. Instead, he declined to sign anything at all, even an acknowledgement that he had been read his rights. In this Circuit an express or oral waiver of constitutional rights is not necessary to establish a knowing waiver. *United States v. Silva*, 715 F.2d 43, 49 (2d Cir.1983). When one is read one's rights, indicated that one understands them, answers the questions put and does not ask for the questioning to stop or for a lawyer, one has exercised a knowing and voluntary waiver. *Id.*

Nothing here should be construed as a criticism of the inspector's conduct in questioning Camacho. As events revealed, it was indeed essential to watch his every move, as there were weapons hidden in the apartment, including one in the bathroom, which Camacho visited twice. However, that inspectors were duly attentive does not change the fact that the restrictions that they put on Camacho were the type that would have led a reasonable person under the circumstances to believe that he was not free to go. For *Miranda* purposes, the inspectors proceeded correctly by reading Camacho his rights virtually simultaneously to the time that they imposed significant restrictions on him. An-

other path that they could have taken was to advise Camacho explicitly that he was free to leave at any time, as the agents in *Ross* did, but the agents in *Ceballos* did not.

### The Pill Bottles

While searching for the fruits of child pornography as listed in the warrant, another Inspector, Robert Harnois ("Harnois") discovered a number of pills in bottles that Camacho seeks to suppress here. The government contents that each of the items in question was lawfully seized pursuant to the "plain view" doctrine.

The plain view doctrine permits the warrantless seizure of items which are in plain view where: 1) the seizing officers are lawfully on the premises; 2) the items are discovered "inadvertently"; and 3) it is "immediately apparent" to the officers that the items are evidence of a crime, contraband, or otherwise subject to seizure. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–70, 91 S.Ct. 2022, 2037–40, 29 L.Ed.2d 564 (1971). There is no dispute here that the inspectors were lawfully in Camacho's apartment to execute the warrant, and he concedes that the discovery of the items remaining at issue in this motion was inadvertent; that is, it occurred in the course of an appropriate search for the items called for by the warrant. However, Camacho submits that it was not "immediately apparent" to the inspectors that the items at issue were either evidence of a crime, contraband, or otherwise subject to seizure. "Immediately apparent" means that an officer must have "probable cause to associate the property with criminal activity" before its warrantless seizure will be upheld. *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983), and, according to Camacho, the inspectors did not have probable cause to believe that the pills in the bottles at issue were illegal drugs.

According to the government, probable cause to seize any bottle of pills in the apartment was established after the inspectors discovered evidence of narcotics possession and trafficking: "red-flag" LSD in a clear plastic bag, cocaine in a vial with a spoon attached, a clear plastic bag labeled "MDA", a hash pipe, a triple beam scale, and a price list for controlled substances.

The government's position is not aided by the testimony of Inspector Harnois, who repeatedly testified that he did not know what was in the bottles, that he had no expertise in recognizing specific types of pills, and that he seized a number of bottles because of the "possibility"—not probability—that they might contain illegal drugs:

[Mr. Lipson]: Maybe we can save some time. Is it your testimony that because in this brown bag, which contained something like 12 or 13 different bottles, because you found in that same brown bag one small bottle that said Super Trip, you concluded that anything else in that bag that contained what looked like medicine or drugs was something that you could and should seize from the apartment?

A. Yes, because of the *possibility* that any one of those capsules could *possibly* have been some type of controlled substance, as opposed to what they were actually labeled to be.

Q. And if you had found an aspirin bottle in that brown bag that had little white tablets that looked like [they] might have been aspirin, you would have seized that because of the possibility that it was laced with LSD?

A. There is that *possibility* which exists. (emphasis added)

Despite Harnois' testimony that it was "possible" that the bottles contained illegal drugs, as a matter of law, when law enforcement agents find the quantity of narcotics paraphernalia that was present at Camacho's apartment, there is probable cause to believe that any pill in the apartment, no matter the label on it, is an illegal substance which may be lawfully seized if the other requirements of the plain view doctrine are satisfied.

Parties will contact the courtroom deputy to arrange a conference to set a trial date.

IT IS SO ORDERED.