UNITED STATES of America, Plaintiff,

v.

**Judith Kay LEVINSON, Elliot Lane Levinson, and Equs Distributing, Inc., Defendants.**

**CR–S–91–040–PMP (LRL).**

United States District Court,
D. Nevada.

March 23, 1992.

Carl Alexandre, William Wagner and Janis Kockritz of the U.S. Dept. of Justice, Washington, D.C., for plaintiff.

John H. Weston and Clyde F. DeWitt, Beverly Hills, Cal., for defendants.

## ORDER

PRO, District Judge.

On June 21, 1991, Defendants filed a Motion to Suppress Evidence of Certain Out-of-Court Statements Made by Defendant (# 39). On January 14, 1992, the Honorable Lawrence R. Leavitt entered a Report and Recommendation (# 84) recommending the granting of Defendants' above-referenced Motion. The Government filed Objections thereto (# 90) on March 5, 1992, in accordance with Local Rule 510–2 of the Rules of Practice of the United States District Court for the District of Nevada, to which Defendants Responded (# 93) on March 19, 1992. On March 20, 1992, the Clerk of Court referred Defendants' Motion to the undersigned for consideration.

The Court has conducted a *de novo* review of the record in this case in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Local Rule 510–2 and finds that the

evidence supports the factual findings set forth in Judge Leavitt's Report and Recommendation entered January 14, 1992.

IT IS THEREFORE ORDERED that the Report and Recommendation of Magistrate Judge Leavitt entered January 14, 1992 (# 84) is affirmed and Defendants' Motion to Suppress Evidence of Certain Out-of-Court Statements Made by Defendant (# 39) is granted.

## REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Filed Jan. 14, 1992

LAWRENCE R. LEAVITT, United States Magistrate Judge.

The defendants Judith Kay Levinson and Elliot Lane Levinson (hereafter "Judith" and "Elliot") are charged with conspiring to use and knowingly using an express company or other common carrier to transport obscene videotapes in interstate commerce, in violation of 18 U.S.C. §§ 371 and 1462, respectively. The matter presently before the Court is their Motion to Suppress Evidence of Certain Out-of-Court Statements Made by Defendants (# 39, filed June 21, 1991). At issue is the admissibility of statements they made in their home to an FBI agent while other agents and police officers were searching the home pursuant to a search warrant. The defendants contend that the statements should be suppressed because (1) at the time they made the statements they were effectively in custody and had not been given their *Miranda* warnings, (2) Judith's statements were involuntary in that they were induced by a false promise that nothing she said would be used against her, and (3) the statements were the product of an illegal search.

In its Response (# 50, filed July 5, 1991), the government contends that at the time Judith and Elliot were interviewed no *Mi-*

*randa* warnings were required because they were not in custody. Moreover, the government denies that Judith was ever promised either expressly or impliedly that her statements would not be used against her. Finally, of course, the government maintains that the search of the defendants' home was lawful.[1]

## THE EVIDENCE

An evidentiary hearing was conducted before the undersigned Magistrate Judge on October 8, 1991. Special Agent Roger Young of the FBI testified on behalf of the government. Both defendants testified on their own behalf. The hearing revealed the following facts.

On May 17, 1990, at 9:20 a.m., five FBI agents, armed with a search warrant and accompanied by two detectives from the Los Angeles Police Department, went to the defendants' home in Agoura, California. They were wearing wind breaker jackets bearing the large identifying letters "FBI" or "LAPD." After knocking loudly and shouting their identity and purpose, they saw Elliot inside the house running up a staircase. The agents opened the front door, and five of the seven men entered the home. One or two of the agents chased Elliot up the stairs while the others fanned out through the house. Both Elliot and Judith were located upstairs and detained on the second floor landing while the other agents and officers secured the premises.

The search was confined principally to two rooms on the second floor which were used by Judith and Elliot as offices. The offices were at opposite ends of the house. Judith and two agents were in her office, and Elliot and some other agents were in his office. The agents explained they had a warrant to search the premises, which they began almost immediately. Downstairs in the kitchen Agent Young was making preparations to interview the defendants. After several minutes Judith was called downstairs. An officer who

---

1. In a separate Motion to Suppress Evidence and for the Return of Property (# 40, filed June 21, 1991), the defendants have challenged the legality of the search. In a Report and Recommendation filed on this day, the undersigned Magistrate Judge concludes that the search was unlawful. The impact of that conclusion on the issues raised in the instant motion will be discussed below.

was upstairs with her said, "We would like you to come downstairs; we'd like to ask you some questions." He then escorted her down the stairs to the kitchen. She testified that by the officer's tone of voice she felt she had no choice but to comply with his request.

When she arrived at the kitchen table, Agent Young said to her, "Have a seat, I want to ask you some questions." Recognizing that Judith was very nervous and frightened, Agent Young told her, "Calm down, it's okay, you're not going to be arrested today." Judith testified that Young also told her, "This is just an interview; nothing will be used against you." Young categorically denied making such a statement. They agree, however, that without giving her any *Miranda* warnings, Agent Young proceeded to interview her outside the presence of the other agents for approximately half an hour concerning the business of Equs Distributing. The interview was conducted in a professional and gentlemanly fashion. At the conclusion of the interview Young told her, "I have no more questions. Send your husband down." She was then escorted back to her office, where she witnessed the search and occasionally assisted the agents in locating documents.

Elliot, who had been assisting the agents in finding documents, heard one of the agents say, "They want him downstairs now, they want him right now." Then the agent said to Elliot, "Go on down there." Elliot was escorted downstairs and found Young at the kitchen table. Because Elliot was obviously frightened, Young told him twice not to worry, that he was "not going to jail today." Without providing *Miranda* warnings, Young proceeded to interview Elliot for about half an hour. This interview also was done professionally and politely.

Elliot testified that due to the "whole feeling in the house," he felt he had to answer Young's questions. For example, prior to being called downstairs, the agents had told him to stay with them in his office. Although no agent or officer ever displayed a weapon or threatened or laid a hand on Elliot or Judith, Elliot testified that it felt as though he were under arrest, because he "couldn't do anything." According to Elliot's uncontradicted testimony, he felt his freedom of movement in his own home was so restricted that he had to and did ask permission to go to the bathroom. He was allowed to go, but only after being escorted to the bathroom door. Elliot testified that he had never before been confronted by law enforcement officers, and that at no time did he feel free to leave the house.

The search lasted for three and a half hours. Young testified that it was his feeling "after the interviews" that the defendants were free to leave the house. However, that "feeling" was probably not communicated to the defendants. Whether it was communicated after the interviews or not, the testimony is clear that *at no time prior to the conclusion of the interviews* were the defendants told they were free to leave.

## DISCUSSION

1. *The Voluntariness of Judith's Statement*

Judith alleges essentially that Agent Young falsely promised her that nothing she said would be used against her. Therefore, she contends, her statement was given involuntarily.

To be voluntary, a confession or admission must not have been "extracted by any sort of threats or violence, *nor obtained by any direct or implied promises, however slight.*" *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). To render a confession involuntary, however, the promise must overbear the accused's will. *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976). In assessing voluntariness the court must consider how the totality of the circumstances impacted on the will of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). The burden is on the government to establish by a preponderance of the evidence that a

challenged confession or admission was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972).

On the record before the Court, the issue of voluntariness is easily resolved. It turns on a simple factual question: did Agent Young tell Judith nothing she said would be used against her? Judith says he did; he says he didn't. The Court finds that he didn't.

The very reason Agent Young interviewed Judith was to obtain self-incriminating statements from her that could be used in court. It is far more likely that Agent Young thought his assurances about not being arrested were sufficient to put Judith at ease than that he deliberately misrepresented his intentions. Moreover, it is noteworthy that no one has alleged that Agent Young told Elliot his statements would not be used against him. Elliot was just as frightened as Judith, and from Young's perspective was in equal need of reassurance. If Agent Young had opted to employ deceit to induce Judith's statement, it is likely he would have used the same technique to induce Elliot's statement.

Judith has pointed to no other circumstance which would suggest that her statements were involuntary. The Court is therefore satisfied by a preponderance of the evidence that Judith's statements to Agent Young were given voluntarily.

### 2. Custodial Interrogation

The issue here is whether at the time the defendants gave their statements they were in a custodial setting within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If they were, their statements must be suppressed, because it is uncontested that they were not given their *Miranda* admonitions.

■ Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way.*" *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added). The

agent's subjective intent to arrest a suspect is not relevant to the "in custody" determination, *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984), except to the extent that the intention to arrest is communicated to the suspect. *United States v. Mendenhall*, 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 1877 n. 6, 64 L.Ed.2d 497 (1980). This Court's inquiry must therefore focus on whether a reasonable person in the shoes of the defendants would, under these circumstances, have felt free to leave. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877.

The question of whether someone believes that he is free to leave requires the court to examine the interaction between the citizen and the police officer as it evolves. Additional restraints, directions, questions or commands can at any time during an interrogation change a suspect's perception of whether he is free to go.... Factors such as strong "requests" given by police officers, "scrupulously watching" a suspect as he is doing things he is perfectly entitled to do, and otherwise conveying a sense of urgency and obligation all contribute to a suspect's reasonable perception that he is not free to leave, *even if he is simultaneously informed that, officially, he is not under arrest.*

*United States v. Camacho*, 674 F.Supp. 118, 122 (S.D.N.Y.1987) (citations omitted) (emphasis added). Because the interrogation here took place in the defendants' home, the Court is persuaded that additional factors should be considered as well, such as whether the agents were invited into the home, whether the defendants voluntarily agreed to submit to questioning, and whether the defendants were free to ask the agents to leave. *See United States v. Hocking*, 860 F.2d 769, 773 (7th Cir. 1988).

■ Although the agents were in the home for three and a half hours, the critical time period for the purposes of this inquiry is roughly the first hour and a quarter. That was the amount of time immediately following the agents' entry into the home that Agent Young took to

prepare for and complete the interviews of Judith and Elliot. What happened after the interviews is irrelevant to the issue before the Court.

The defendants' first contact with the agents was the sight and sound of five agents rushing uninvited into their home, with one or two of them running up the stairs in pursuit of Elliot. Upon their initial face to face confrontation with the agents Judith and Elliot were physically restrained while other agents swept through their house. Elliot, who was clad only in a bathrobe, and Judith were told that the agents had a warrant and were going to search their home. Elliot was permitted to get dressed. They were not told they could leave the house if they wished. Certainly they did not feel they could ask the agents to leave. Neither defendant had ever before been arrested or subjected to a search. They were, at the very least, extremely frightened and upset. This was the atmosphere preceding the interviews which were to follow.

At first Judith and Elliot were told to stay upstairs in their respective offices with the agents who were conducting the search. A few minutes later Judith, and thirty minutes later Elliot, were told in authoritative tones that Agent Young wished to speak to them. Each was escorted by another agent to and from the interview. Neither was told at that point that they could decline the interview. Nor were they told they could leave the house. Indeed, the record compels the conclusion that during at least the first hour and fifteen minutes the defendants were not even free to move about their own home unattended.

This was a confrontation with law enforcement officers which began with a show of force and was followed by a series of directives. The environment created by the agents was marked by strong requests, a sense of urgency and obligation, and a feeling of being scrupulously watched. The coercive nature of the confrontation created an "implication of legal obligation," *United States v. Ceballos*, 812 F.2d 42, 48 (2nd Cir.1987), and therefore a custodial

atmosphere that was not easily undone by a simple statement that they would not be arrested "today." Under these circumstances the Court concludes that the defendants reasonably believed they were prisoners in their own home, and had to answer the agent's questions, at least until the interviews were completed. Therefore, the defendants should have been advised of their rights in accordance with the mandate of *Miranda*. The failure to have done so requires the suppression of their statements.

3. *Exploitation of the Unlawful Entry*

As noted above, the Court on this day has filed a Report and Recommendation concerning the validity of the search warrant by whose authority the agents entered the defendants' home. The Court has concluded that the affidavit supporting the warrant contained an inadequate showing of probable cause. The agents' entry into the defendants' home was therefore unlawful.

■ Evidence obtained during an unlawful search, be it physical or verbal, may not be used at trial unless its seizure was sufficiently attenuated as to purge the primary taint of the unlawful invasion. *Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). "[T]he exclusionary sanction applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980). Therefore, the principal evil against which the doctrine of the "fruit of the poisonous tree" was fashioned in *Wong Sun* were violations of the Fourth Amendment, not the Fifth Amendment right against self-incrimination. *Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975).

■ Hence, even if this Court were to have found that the defendants' statements

were not obtained in violation of the Fifth Amendment, the Court would still be required to consider whether the defendants' statements were obtained by official exploitation of the illegality of the search. The government, of course, bears the burden of proving that subsequent events sufficiently attenuated the taint of the unlawful entry, i.e., that there was a break in the causal chain between the unlawful entry and the giving of the statements. *Brown v. Illinois*, 422 U.S. at 604, 95 S.Ct. at 2262.

■ In the present case the interviews were conducted within minutes of the illegal entry. At no time prior to or during the interviews did the defendants speak to anyone other than the agents and officers. The record does not even suggest that they spoke to each other. Indeed, at least until the interviews were concluded the defendants were never outside the presence of law enforcement personnel. It is apparent that the interviews were "too closely connected in context and time to the illegal [search] to break the chain of illegality." *United States v. Ceballos, supra*, 812 F.2d at 50. Under these circumstances, to permit the defendants' statements to be used against them at trial would undermine the policies and interests of the Fourth Amendment.

### RECOMMENDATION

Based on the foregoing, it is the recommendation of the United States Magistrate Judge for the District of Nevada that the Motion to Suppress Evidence and for the Return of Property (# 40) should be granted.

DATED this 13th day of January, 1992.